**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ELAINE POLLY,

       Plaintiff,

*vs.*
                            Civil Action No. 2:13-CV-85
                            (The Honorable John Preston Bailey)

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

## REPORT AND RECOMMENDATION/OPINION

Elaine Polly ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. Procedural History

Plaintiff filed applications for SSI and DIB on August 18, 2010, alleging disability since June 17, 2010, due to "bulginging [sic] disc 2, 3, 4, and compressed fussed [sic] disc 2 & 3 arthritis; sciatic nerve running from hip to leg causing dragging leg; right arm severe arthritis, bersa wasting bicep muscle; depression at all times;[1] neck locks and then cracks or pops severe pain, untreatable;

---

[1] In her brief, Plaintiff has only presented arguments regarding her physical limitations. Accordingly, the undersigned has focused solely on Plaintiff's medical records concerning her physical limitations, not mental limitations, for the relevant time period.

and sciatic nerve in left leg dragging leg, back has fused dis[c]" (R. 133-38, 148). The state agency denied Plaintiff's application initially and on reconsideration (R. 65, 70, 77, 84). Plaintiff requested a hearing, which Administrative Law Judge Anne Sharrard ("ALJ") held on July 26, 2012, and at which Plaintiff, represented by counsel, Courtney Lemley, and Pam Tucker, a vocational expert ("VE") testified (R. 28-56). On August 28, 2013, the ALJ entered a decision finding Plaintiff was not disabled (R. 8-26). Plaintiff filed a request for review with the Appeals Council (R. 6-7). On October 28, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. Statement of Facts

Plaintiff was born on March 17, 1960, and was fifty-two (52) years old on the date of the administrative hearing (R. 32). She graduated high school (Id.). Plaintiff's past work included computer repair and healthcare (R. 156-163).

On April 29, 2008, Plaintiff presented to the emergency room at Hampshire Memorial Hospital with complaints of pain in her left flank. Her back and legs seemed week and she had tingling in her leg (R. 377). While there, Plaintiff underwent an X-ray of her lumbar spine. The X-ray revealed no fracture and normal bony alignment. Dr. Myung Kim noted that there was "[m]ild disc space narrowing at L5-S1 level. No acute process" (R. 381). Plaintiff was diagnosed with acute back strain (R. 379).

Plaintiff presented to the emergency room at Hampshire Memorial Hospital on January 13, 2009 with complaints of pain radiating from her left leg to her hip. She reported that she had experienced the pain for the past five (5) days (R. 371). Taking Percocet and Flexeril did not help the pain (R. 373). While there, Plantiff underwent an X-ray of her lumbosacral spine. The X-ray

revealed normal alignment, intact "vertebral body heights and intervertebral disc spaces," and unremarkable "sacrum and sacroiliac joints." Dr. Myung Kim's impression was for "[n]ormal lumbosacral spine series" (R. 375). Plaintiff was diagnosed with sciatica syndrome (R. 373).

On January 29, 2009, Plaintiff presented to the emergency room of Braddock Hospital with complaints of pain in her left leg, particularly her hip and thigh. She reported that bearing weight aggravated the pain and leaning forward helped to alleviate it. The pain was also "somewhat" relieved by rest (R. 323, 389). While there, Plaintiff underwent an MRI of her lumbar spine. Dr. Lambert noted that at Plaintiff's "L1-L2 level a mild broad-based disc bulge produces mild flattening of the thecal sac and mild bilateral neural foraminal stenosis." At Plaintiff's "L2-L3 ligamentum flavum hypertrophy and a broad-based disc bulge combine to produce mild spinal stenosis and mild bilateral neural foraminal stenosis." At Plaintiff's "L3-L4 level facet osteoarthritis, ligamentum flavum hypertrophy, and a broad-based disc bulge combine to produce moderate spinal stenosis and there is moderate bilateral neural foraminal stenosis." Dr. Lambert saw a broad-based disc bulge at the L4-L5 level. There was "high T2 signal in the posterior aspect of the disc compatible with an annular tear." There was also "mild bilateral neural foraminal stenosis" (R. 325, 391). Dr. Lambert's impression was for "[m]oderate L3-L4 spinal stenosis" and "[a]nnular tear of the L4-L5 disc with a mild broad-based disc bulge" (R. 326, 392). Plaintiff was diagnosed with lumbar radiculopathy and spinal stenosis and was discharged with a prescription for Percocet (R. 322, 388).

Plaintiff returned to the Braddock Hospital emergency room on February 7, 2009 with complaints of back pain. She reported that her symptoms also included leg pain, tingling, and numbness. The pain was alleviated by lying down (R. 328, 394). Upon examination, Plaintiff was neurologically intact, and the provider did not note any abnormal findings. Plaintiff was diagnosed

with acute back pain and was discharged home (R. 327, 393).

Four days later, Plaintiff returned to the Braddock Hospital emergency room, again with complaints of back pain. She had been experiencing leg pain, tingling, numbness, and weakness. The pain was exacerbated by bending (R. 330, 396). Upon examination, Plaintiff's extremities were nontender, and she had an adequate range of motion without pain. Plaintiff had a positive straight leg raise with her left leg at 30 degrees. She was diagnosed with acute sciatica and discharged home with a prescription for Percocet (R. 329, 395).

On February 18, 2009, Plaintiff returned to the Braddock Hospital emergency room with complaints of back and leg pain. Her pain was aggravated by bending and lifting; it was relieved by rest and medication (R. 332, 398). Upon examination, Plaintiff had a positive straight right leg raise. She was diagnosed with exacerbation of chronic back pain and was discharged home with a prescription for Tramadol (R. 331, 397).

Plaintiff underwent an x-ray of her lumbar spine on March 30, 2009. Dr. Robert Miller noted that there was "no fracture or subluxation." He noted "[m]inimal osteophytic lipping along the vertebral margins" which indicated "lumbar spondylosis." His impression was "[n]o acute change. Changes of lumbar spondylosis are noted" (R. 333, 399). Plaintiff also underwent an X-ray of her sacrum and coccyx. Dr. Miller noted that there was no "fracture or subluxation" and that Plaintiff's sacroiliac joints were normal (R. 336, 402).

On December 16, 2009, Plaintiff presented to Hampshire Memorial Hospital for an x-ray of the cervical spine for neck pain. The findings were "normal bony alignment. No fracture is noted. The disc spaces are unremarkable." The impression was "no fracture or acute process"(R. 207).

On June 3, 2010, Plaintiff presented to Hampshire Memorial Hospital complaining of chronic

4

neck and shoulder pain (R. 220, 356).  While there, Plaintiff underwent an X-ray of her right shoulder.  Dr. Myung Kim noted: "The bony structures are within normal limits, showing no evidence of acute fracture or dislocation.  No evidence of significant degenerative or inflammatory change is noted.  The overlying soft tissue shadows are also unremarkable."  Dr. Kim's impression was for a normal examination (R. 226, 360).  Dr. Ahmad Baray diagnosed Plaintiff with a shoulder injury (R. 224).

On June 14, 2010, Plaintiff presented to Hampshire Memorial Hospital complaining of having muscle spasms in her neck, bag, and legs.  She had been in a motor vehicle accident the previous night.  Plaintiff reported that she had passed out three times the previous night and still felt dizzy (R. 228, 307).  Plaintiff underwent a CT scan of her head.  Dr. Kim noted: "Normal CT examination of the cerebral parenchyma.  The calvarium and base of the skull are also entirely unremarkable" (R. 234, 311).  Plaintiff also underwent an X-ray of her cervical spine.  Dr. Kim's impression was for "1. Minimal degenerative arthritis with minimal spondyloses.  2. Congenital incomplete segmentation is seen at C2-C3" (R. 235, 312).  Dr. Abdul Qureshi diagnosed Plaintiff with a neck strain (R. 232, 310).

On June 25, 2010, Plaintiff presented to Hahn Medical Practice complaining of right arm pain.  Upon examination, Plaintiff had an appropriate affect.  The provider, whose name is illegible, did not note any abnormalities except an inflamed nose.  The provider assessed shoulder pain and smoking cessation (R. 247).

On July 21, 2010, Plaintiff visited the Western Maryland Regional Medical Center with complaints of pain in her right upper arm, shoulder, and neck.  She noted that the pain felt like a burning or tingling sensation.  Upon examination, Plaintiff's neck was supple and non-tender (R.

337, 403). While there, Plaintiff underwent an MRI of her right shoulder. Dr. Charles Magal noted that there was "a small quantity of fluid in the AC joint, accompanied with bony osteophyte synovial hypertrophy." There was also "fluid in the subacromial subdeltoid bursa." Dr. Magal noted no evidence of a rotator cuff tear. His impression was for "[v]ery mild subacromial subdeltoid bursitis" and "[m]oderately severe osteoarthritis disease in the AC joints with no evidence for rotator cuff tear" (R. 339, 405). Plaintiff also underwent an MRI of her cervical spine. Dr. Magal noted that there was "partial fusion at the C2-C3 vertebral body level with small disc noted anteriorly." Furthermore, Plaintiff's "C3-C4 disc demonstrate[d] mild central bulge with no significant compression on the cervical spinal cord," and her "C4-C5 disc level demostrate[d] mild bulge with no significant compression on the cervical spinal cord" (R. 341, 407). Dr. Magal's impression was for "[m]ild disc bulging C3-C4 and C4-C5 with no significant compression on the cervical spinal cord" (R. 341-42, 407-08). Plaintiff was diagnosed with shoulder pain (R. 338, 404).

On August 20, 2010, Plaintiff presented to Hahn Medical Practice complaining of right arm pain and left leg dragging. Upon examination, Plaintiff had a decrease range of motion because of pain. The provider, whose name is illegible, assessed depression and pain syndrome. She was prescribed Celexa, Zyprexa, Neurontin, and Tramidol. (R. 241).

Plaintiff returned to Hahn Medical Practice on October 1, 2010, with complaints of pain in her right arm, left leg, and back. She stated that she was not sleeping again. Plaintiff also complained of joint pain and muscle weakness. Upon examination, PA M. Swartz noted that Plaintiff was, generally, in good health. She had slowed movement and a decreased range of motion in her neck because of pain. Plaintiff was also tender to palpation along her right upper trapezius muscle. She had decreased range of motion and increased crepitus in her right shoulder. M. Swartz diagnosed Plaintiff with pain syndrome and insomnia. She was given a referral for an orthopedist

for her neck and shoulder pain, and was prescribed Tramadol, Nexium, Neurontin, and Seroquel (R. 306, 321).

Plaintiff completed a Function Report–Adult on October 15, 2010. In that report, Plaintiff stated that on a typical day, she wakes up, takes her pain medication, goes to the kitchen to eat breakfast, and tries to clean. Her sons cooked and washed clothes. Plaintiff stated that her conditions affected her sleep because her pain was so severe that it would wake her up and she would have to change position. She could not dress without help, and she used one arm to bathe, shave, and care for her hair (R. 165). Plaintiff could prepare her own meals and often prepared sandwiches. She did laundry, mowing, ironing, and vacuuming as household chores (R. 166). Plaintiff went outside two (2) to three (3) times per week; she could drive and go out alone. Plaintiff shopped in stores for household items twice a month. She was able to pay bills, count change, handle a savings account, and use a checkbook/money orders (R. 167). Plaintiff reported that her hobbies included riding horses and bowling, but that she could not do them because of her conditions. Plaintiff did not spend time with others (R. 168). She stated that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and use her hands. Plaintiff could walk at most 300 feet before needing to stop and rest for ten (10) to twenty (20) minutes (R. 169).

Plaintiff saw Dr. Stephen Nutter for an internal medicine examination on December 15, 2010. She complained of pain her back and neck. Plaintiff stated that her back pain was constant and radiated down her left leg. Her neck pain was also constant but did not radiate down her arms. Her pain was located "in the lumbar area, cervical area and lowermost thoracic area." Plaintiff's back pain was aggravated by bending, sitting, standing, lifting, vibration, and coughing or sneezing; her neck pain was aggravated by turning her head and rapid head movement. Plaintiff also complained

of joint pain in her hands, right elbow, shoulders, left hip, and left knee. She also had pain in her right shoulder. Her shoulder pain was aggravated by pulling, reaching overhead, reaching out, lifting, and repeated use; her knee pain was aggravated by standing, walking, kneeling, squatting, and walking up and down stairs (R. 275). Plaintiff also reported that she had been diagnosed with fibromyalgia and that her left knee would give out, causing her to fall (R. 275-76). She stated that she had been diagnosed with asthma and could only walk fifty (50) yards before having to stop because of shortness of breath (R. 276).

Upon examination, Dr. Nutter noted that Plaintiff had a normal gait, but was uncomfortable in both the supine and sitting positions (R. 276). Her shoulders showed "evidence of pain with movement and tenderness." Plaintiff's right shoulder had 100 degrees forward flexion, 90 degrees internal and external rotation, and 160 degrees abduction. Her left shoulder had 180 degrees forward flexion, 90 degrees internal and external rotation, and 180 degrees abduction. Plaintiff's bilateral elbows had 150 degrees of flexion and zero (0) degrees extension. Her bilateral wrists had 70 degrees flexion and 60 degrees extension. Plaintiff was able to make bilateral fists and had grip strength "being equal and normal at 5/5 bilaterally." Dr. Nutter found that Plaintiff's left knee showed "evidence of pain with movement and tenderness." Her bilateral knees had 130 degrees flexion and zero (0) degrees extension. Her bilateral ankles had 40 degrees plantarflexion and 20 degrees dorsiflexion (R. 277).

Dr. Nutter found that Plaintiff had pain "with ROM testing of the cervical spine." Her cervical spine had 50 degrees flexion, 30 degrees extension, 35 degrees left tilt, 30 degrees right tilt, 80 degrees left rotation, and 50 degrees right rotation. Plaintiff's lumbar spine had normal curvature and 45 degrees flexion, 5 degrees left side bend, and 10 degrees right side bend. She had pain "with

ROM testing of the lumbar spine." Dr. Nutter noted that there was "tenderness to palpation of the paraspinal muscles of the thoracic and lumbar spine." Plaintiff had a normal straight leg raise test in the sitting and supine positions. She could stand on one leg with no difficulty. "ROM testing" of her hip caused back pain. Plaintiff's bilateral hips had 110 degrees of flexion. Dr. Nutter found that Plaintiff had normal touch, pin prick, and vibratory sensations. Her deep tendon reflexes were "normal at 2/4 bilaterally in the upper and lower extremities." Plaintiff could walk on her heels and toes, but had trouble "performing tandem gait due to poor balance." She was unable to squat because of back, knee, and hip pain. She had "mild difficulty" getting out of a supine positions. Plaintiff's shoulder strength was limited from pain. Dr. Nutter found "submaximal voluntary effort and give away weakness noted with strength testing." He diagnosed Plaintiff with chronic cervical and lumbar strain and degenerative arthritis. In sum, he noted that Plaintiff exhibited "range of motion abnormalities of the cervical and lumbar spine." She also demonstrated muscle weakness, joint pain, tenderness, and a decreased range of motion (R. 278).

Plaintiff returned to Hahn Medical Practice on December 16, 2010 for a follow-up for her pain syndrome. She complained of experiencing joint pain. Upon examination, the provider, whose name is illegible, noted that Plaintiff appeared to be in moderate distress because of her back, neck, and right shoulder pain. She had limited range of motion in her right shoulder and neck. The diagnosis is illegible; however, Plaintiff was prescribed Seroquel, Neurontin, Nexium, Mobic, Flexeril, and Tramadol (R. 304, 319).

On January 4, 2011, Dr. Porfirio Pascasio completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found that Plaintiff could occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; stand, walk, and sit for about six (6) hours in an eight (8)-

hour workday; and was unlimited with pushing and pulling (R. 281). Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she could never climb ladders, ropes, and scaffolds (R. 282). Dr. Pascasio found that Plaintiff needed to avoid concentrated exposure to extreme cold and heat, fumes, odors, dusts, gases, poor ventilation, and hazards (R. 284). He noted that Plaintiff was partially credible (R. 285).

On June 13, 2011, Plaintiff returned to Hahn Medical Practice. She complained that her medications were not helping her pain. Particularly, she complained that Tramadol was not helping her right arm and back pain. The provider, whose name is illegible, noted that Plaintiff worked in home care. The provider diagnosed chronic pain and prescribed Cymbalta, Ultram, Seroquel, and Nexium (R. 303, 318).

Plaintiff returned to Hahn Medical Practice for a follow-up regarding her new medication on July 7, 2011. She complained that Cymbalta made her dizzy. The provider, whose name is not listed, diagnosed chronic pain. The provider directed Plaintiff to stop taking Cymbalta and prescribed Ultram, Vimovo, Naproxen, and Dexilant (R. 302, 317).

On August 11, 2011, Plaintiff returned to Hahn Medical Practice with complaints that Naproxen and Dexilant were not helping her lower back, neck, and right arm pain. She was prescribed Flexeril, Nexium, Ultram, and Celebrex (R. 301, 316).

Plaintiff had a follow-up appointment for her chronic pain at Hahn Medical Practice on October 6, 2011. She needed a Tramadol refill. The provider, whose name is not listed, noted that Plaintiff had a "fair" physical assessment. The provider assessed pain syndrome and GERD, and prescribed Plaintiff Ultram, Prilosec, and Mobic (R. 300, 315).

On October 27, 2011, Plaintiff returned to Hahn Medical Practice because she needed a refill

of Trazodone. The provider, whose name is not available, diagnosed asthma and prescribed Trazodone, Flexeril, and Albuterol (R. 299, 314).

Plaintiff returned to Hahn Medical Practice on February 4, 2012, for a medication check. Plaintiff reported that she was "doing well" and that her medications were "working well." Upon examination, the provider, whose name is illegible, noted that Plaintiff was "doing good!" The provider diagnosed Plaintiff with chronic pain syndrome and prescribed Tramadol, Flexeril, Trazadone, and Prilosec (R. 298, 313).

<u>Administrative Hearing</u>

At the administrative hearing, Plaintiff testified that she lived with her husband and her nineteen (19)-year old and thirteen (13)-year old sons (R. 32). She was "currently working through help of medication" as an in-home CNA. Her job involved a lot of "lifting and pulling and tugging." Plaintiff took Tramadol for her pain, but the Tramadol was "not working anymore. Her pain caused her to wake up every two (2) hours at night (R. 33).

Plaintiff testified that she could no longer even work a six (6)-hour shift as an in-home CNA. She had taken some courses so that she could administer medications as part of her position. Plaintiff had to do more driving and "getting in and out of the car," which caused more pain in her back and her leg (R. 35). Plaintiff testified that she drove a car with a manual transmission and that she needed to sell it because she could no longer push in the clutch (R. 35-36). Her job involved a lot of lifting because she had to do daily grocery shopping for her patients. Plaintiff's sons had to help her at work to do the "heavy work" for her. They had been helping her for the past two (2) years (R. 38). Plaintiff testified that she needed her sons to push one patient who used a wheelchair because one day, Plaintiff tried to push her and they "went flying down the hill together" (R. 40).

When asked about her pain, Plaintiff stated that she experienced pain in her left leg. It would start from the middle of her calf and go up to her hip bone (R. 40). Her pain caused her to fall "quite a bit." Plaintiff testified that she had fallen six (6) or seven (7) times in the past two (2) weeks (R. 41). Her shoulder was also in pain "constantly." Plaintiff was left-handed but had to do everything except writing with her right hand. However, when Plaintiff used her other hand, her back locked up. Plaintiff had tried physical therapy with a friend (R. 42). She had also tried arm circulation and leg pedaling exercises. Plaintiff had received shots in her shoulder "numerous times to no avail." Her doctor told her she needed surgery or her condition would "get worse and worse and worse." If Plaintiff picked up an item with her right arm, she would often drop it. Her fingers went numb, and it would take her 45 minutes to write a letter or complete her timesheets (R. 44). On days when Plaintiff was not working, she would sit on her bed or try to walk to the porch. Her family did not let her walk outside by herself because they were afraid she would fall. Plaintiff used a cane around the house, but not at work because she did not want to cause her patients to trip. Plaintiff loved to cook, but did not cook much because of her pain (R. 45).

Plaintiff could sit for five (5) to ten (10) minutes before she needed to "wiggle around to find a comfortable spot." It was very difficult for her to get up after sitting. She could stand and walk for about five (5) minutes before needing to lean across her counter to ease the pain. Plaintiff could lift a can of beans but could not lift anything "with any weight to it at all." Before, she could carry a sack of flour, or about five (5) to ten (10) pounds (R. 46). Plaintiff went to church every Sunday if her husband or son took her. She had to take pillows to sit on (R. 47). Plaintiff used to love to go bowling, cook, and ride horses. She also "used to love her job." Plaintiff had to give up her hobbies in the "latter part of 2009." She testified that she used to be a "very active, active person"

and that if she had a choice she "would not be sitting still" (R. 48).

The ALJ asked the VE the following hypothetical question:

All right. Now I'm going to ask you some hypothetical questions. Please assume an individual of the same age, education and work experience of the claimant, who has the following residual functional capacity. This person would be limited to light work. This person would need a sit/stand option at will as long as she were not more than 15 percent off task. This person could never climb ladders, ropes or scaffolds or could occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl. This person could occasionally reach overhead with the right upper extremity, which is the dominant upper extremity except for writing. And this person would have to avoid concentrated exposure to extreme cold and heat, pulmonary irritants such as fumes, odors, dust and gases and work hazards. Could this individual perform either the claimant's past work, either as she performed it or as it is generally performed?

(R. 50.) The VE responded that such an individual could not perform Plaintiff's past work, but could perform the jobs of office helper, with 30,000 jobs nationally and 1,000 jobs regionally; mail clerk, with 33,000 jobs nationally and 1,200 jobs regionally; and labeler, with 35,000 jobs nationally and 2,000 jobs regionally.[2] The ALJ then asked:

Okay. If for hypothetical number two I added that this person could not reach with the upper, the right upper extremity, would that change your answers to the first hypothetical?

(R. 51). The VE responded that such an individual could still work as an office helper, with 60,000 positions nationally and 500 positions regionally, and a labeler, with 16,000 positions nationally and 1,000 regionally (R. 52).

The ALJ next asked:

For my third hypothetical, if you took the first hypothetical, but instead of light this person would be limited to sedentary work, would there be jobs that exist in the regional or national economy that such an individual could perform?

---

[2] All numbers cited that were given by the VE represent the number of jobs available with an at will sit/stand option.

The VE responded that such an individual could perform the jobs of document preparer, with 24,000 positions nationally and 700 positions regionally; address clerk, with 25,000 positions nationally and 500 positions regionally; and telephone soliciting clerk, with 71,000 positions nationally and 800 positions regionally (R. 52-53). Finally, the ALJ asked:

> Okay. And my next hypothetical, if this individual under any prior hypotheticals were off task more than 15 percent of the day, would there be any jobs in the national economy that such an individual could perform?

The VE stated that such an individual could not perform any job in the national economy (R. 53).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920,  ALJ Sharrard made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.

2.  The claimant has not engaged in substantial gainful activity since June 17, 2010, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.  The claimant has the following severe impairments: degenerative arthritis; chronic pain syndrome; and minimal cervical spondylosis and congenital incomplete segmentation at C2-3 (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant needs a sit/stand option as long as she is not more than 15% off task.  The claimant can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, crawl, and cannot climb ladders, ropes or scaffolds.  The claimant can do no reaching with the right upper extremity, which is her dominant extremity for all activities except writing, and she should avoid concentrated exposure to extreme cold and heat, pulmonary irritants such as fumes, odors, dusts, gases

14

and work hazards.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March 17, 1960, and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 17, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 13-26.)

## IV.  Discussion

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that

substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.    Contentions of the Parties

The Plaintiff contends:

1.     The ALJ's residual functional capacity determination is not supported by substantial evidence.

(Plaintiff's Brief at 8-11.)

The Commissioner contends:

1.     The ALJ's RFC assessment is supported by substantial evidence and did not require an exhaustive function-by-function analysis.

2.     The ALJ reasonably determined that even with a sit/stand option, Plaintiff could perform a limited range of light work.

(Defendant's Brief at 8-14.)

In her response to the Commissioner's brief, Plaintiff contends:

1.     The ALJ's Step Five finding is not supported by substantial evidence.

(Plaintiff's Response at 1-3.)

## C.    Sit/Stand Option

Plaintiff first asserts that "the ALJ did not clearly set out all of Plaintiff's limitations with a

function-by-function assessment." (Plaintiff's Brief at 8.) Specifically, Plaintiff argues that the ALJ "omitted the time periods associated with sitting and standing for the sit/stand option." (Id.) In her reply to Defendant's Brief, she states that the "issue here is whether the ALJ's controlling hypothetical question to the VE was sufficient for the VE to provide testimony which can serve as substantial evidence to support the ALJ's denial of benefits at Step Five of the sequential evaluation." (Plaintiff's Reply at 1.) According to Plaintiff, because the ALJ did not include time periods relative to the sit/stand option in her hypotheticals to the VE, the "VE's testimony cannot serve as substantial evidence to support the ALJ's finding of not disabled." (Id. at 2.) The undersigned's analysis below considers whether both the ALJ's RFC formulation and hypothetical to the VE, as to the sit/stand option, are supported by substantial evidence.

A claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the

burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

Furthermore, if a claimant has met her burden of showing that she is not able to perform her past relevant work, the Commissioner then has the burden of showing that the claimant can perform work existing in significant numbers in the national economy. See McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976). During Step Five of the sequential analysis, the ALJ must pose hypotheticals to the VE that "fairly set out all of [the] claimant's impairments." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (alteration in original); see also Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (hypotheticals must "adequately" describe the claimant's impairments). However, the ALJ need only include those limitations supported by the record in the hypotheticals. Johnson, 434 F.3d at 659. Furthermore, an ALJ is not required to "submit to the [VE] every impairment alleged by a claimant." Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (alteration in original).

In pertinent part, SSR 83-12 provides the following guidance to an ALJ when making a disability determination for a claimant requiring a sit/stand option:

> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for a while before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)
>
> There are some jobs in the national economy–typically professional and managerial

ones–in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983).[3]

The ALJ found the following with regard to Plaintiff's RFC:

After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant needs a sit/stand option as long as she is not more than 15% off task. The claimant can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch, crawl, and cannot climb ladders, ropes, or scaffolds. The claimant can do no reaching with the right upper extremity, which is her dominant extremity for all activities except writing, and she should avoid concentrated exposure to extreme cold and heat, pulmonary irritants such as fumes, odors, dusts, gases, and work hazards.

(R. at 17). Furthermore, the ALJ's first hypothetical to the VE was as follows:

All right. Now I'm going to ask you some hypothetical questions. Please assume an individual of the same age, education and work experience of the claimant, who has the following residual functional capacity. This person would be limited to light work. This person would need a sit/stand option at will as long as she were not more than 15 percent off task. This person could never climb ladders, ropes or scaffolds or could occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl. This person could occasionally reach overhead with the right upper extremity, which is the dominant upper extremity except for writing. And this

_____

[3] In her brief, Plaintiff cites to SSR 96-9p for the propositions that the RFC assessment "must be specific as to the frequency of the individual's need to alternate sitting and standing" and the "extent of the erosion will depend on the facts in the case record." (Plaintiff's Brief at 9.) However, SSR 96-9p provides guidance to an ALJ when making a disability determination for a claimant who has the RFC for less than a full range of sedentary work and who requires a sit/stand option. See SSR 96-9p, 1996 WL 374185 (July 2, 1996). Accordingly, the undersigned finds that because the ALJ found that Plaintiff could perform less than a full range of **light** work, SSR 96-9p is inapplicable. See, e.g., Hodge v. Barnhart, 76 F. App'x 797, 800 (9th Cir. 2003) ("Ruling 96-9p does not apply to light work."); Vallejo v. Astrue, No. 3:10cv334, 2011 WL 4595259, at *8-10 (W.D.N.C. Aug. 4, 2011).

person would have to avoid concentrated exposure to extreme cold and heat, pulmonary irritants such as fumes, odors, dust and gases and work hazards. Could this individual perform either the claimant's past work, either as she performed it or as it is generally performed?

(R. at 50.) The ALJ's following hypotheticals asked the VE to assume the same individual with additional limitations. (See R. at 51-53.)

Given these, the undersigned agrees with Plaintiff that the ALJ did not specify the frequency of Plaintiff's need to change positions. However, this Court has previously held that "'the reasonable implication of an ALJ's silence regarding the frequency of a claimant's need to alternate between sitting and standing is that the sit/stand option is "at-will," "as needed," or otherwise at a claimant's own volition.'" Bentley v. Comm'r of Soc. Sec., No. 1:13CV163, 2014 WL 906587, at *18 (N.D. W. Va. Mar. 7, 2014) (quoting Ruff v. Colvin, No. 1:12-cv-165-RJC, 2013 WL 4487502, at *7 (W.D.N.C. Aug. 20, 2013)). Several courts have agreed. See Ketelboeter v. Astrue, 550 F.3d 620, 626 (7th Cir. 2008); Buckner-Larkin v. Astrue, 450 F. App'x 626, 627 (9th Cir. 2011); Williams v. Barnhart, 140 F. App'x 932, 936=37 (11th Cir. 2005); Pierpalio v. Astrue, C/A No. 4:10-2401-CMC-TERM, 2011 WL 7112913, at *6 (D.S.C. Dec. 15, 2011); Robinson v. Astrue, No. 4:10CV01417 JLH, 2011 WL 5402408, at *6-7 (E.D. Ark. Nov. 8, 2011); Foster v. Astrue, No. 3:08-cv-960-J-12HTS, 2009 WL 4757239, at *2 (M.D. Fla. Dec. 10, 2009); Staples v. Astrue, Co. 08-200-B-W, 2009 WL 232496, at *3 (D. Me. Jan. 29, 2009); Young v. U.S. Comm'r of Soc. Sec., No. CV08–0474, 2009 WL 2827945, at *12 (W.D. La. Sept. 1, 2009); Magee v. Astrue, No. 5:05CV413, 2008 WL 4186336, at *7 (N.D.N.Y. Sept. 9, 2008). No greater specificity is required. See Thompson v. Astrue, 442 F. App'x 804, 807 (the "ALJ's RFC finding and hypothetical were consistent with an at-will sit-stand option" and that "no greater specificity was required").

Here, the undersigned finds that the reasonable implication is that the frequency of Plaintiff's

need to alternate sitting and standing was at her own volition. Indeed, the ALJ's hypotheticals to the VE specifically mentioned at "at will" sit/stand option. (R. at 50-53.) Plaintiff has not presented any evidence explaining why she could not perform the jobs identified by the VE based upon her ability to sit and stand, and Plaintiff's counsel did not question the VE during the hearing regarding the impact of the sit/stand option. See Ruff, 2013 WL 4487502, at *8. Accordingly, the undersigned finds that substantial evidence supports the ALJ's RFC finding as to Plaintiff's need to alternate sitting and standing.

### D. Light vs. Sedentary Work

Plaintiff also alleges that the "ALJ failed to explain how substantial evidence of record was consistent with a light work rather than a sedentary work residual functional capacity finding." (Plaintiff's Brief at 8-9.) Specifically, Plaintiff asserts that the "ALJ fail[ed] to clearly set out the maximum amount of work-related activity [she] could perform, [and] also did not even provide a hint based on any medical opinion or evidence available in the record." (Id. at 10.) In her reply brief, Plaintiff takes issue with the ALJ not including "the amount of time [she] could sit, stand, and walk, and to include the intervals at which [she] would need to change position from standing to sitting." (Plaintiff's Reply at 2.) According to Plaintiff, "the difference between a light RFC and a sedentary RFC also represents the difference between a non-disability or disability finding." (Plaintiff's Brief at 11.) Defendant argues that Plaintiff's functional capacity exceeded the criteria for sedentary work. (Defendant's Brief at 10-13.)

Once an ALJ determines the claimant's RFC, he may use the Medical-Vocational Guidelines (the "Grids") to determine that claimant's level of disability and potential for employment. See Walker, 889 F.2d at 50. The Grids categorize work by physical exertion requirements. According

to the Grids, "light work" is defined as:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing–the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). **Relatively few unskilled light jobs are performed in a seated position.**

SSR 83-10, 1983 WL 31251, at *5 (1983) (emphasis added). "Sedentary work" is defined as:

> involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.
>
> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

Id. When a claimant only suffers from exertional limitations, the ALJ must consult the Grids to determine eligibility for benefits. See Walker, 889 F.2d at 49; see also Cooper v. Sullivan, 880 F.2d 1152, 1155 (9th Cir. 1989).

"However, some limitations, such as the option to sit or stand, are not addressed in the Grids." Gibson v. Astrue, No. 3:10CV226, 2010 WL 4789659, at *4 (E.D. Va. Oct. 27, 2010), R&R accepted and adopted by 2010 WL 4788211 (Nov. 16, 2010). In such cases, "[w]here an individual's exertional RFC does not coincide with the definition of any one of the ranges of work as defined . . . in the regulations, the occupational base is affected and may or may not represent a significant

number of jobs in terms of the rules directing a conclusion as to disability." SSR 83-12, 1983 WL 31253, at *2. When "the individual's exertional limitations are somewhere 'in the middle' in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability." Id. at 3. In such situations, assistance from a VE "is advisable." Id.

Indeed, as noted above, SSR 83-12 "specifically discusses 'Special Situations,' analogous to [Plaintiff's] condition, where a claimant must be able to alternate sitting and standing while at work, and advises consultation of a [VE]." Henderson v. Soc. Sec. Admin., 87 F. App'x 248, 251 (3d Cir. 2004). The Fourth Circuit, in discussing SSR 83-12, has noted that "[t]he Ruling acknowledges that there are jobs that allow sit/stand options. It directs the agency to consult with a VE to assess the impact of that option on the occupational base. The ruling does not prescribe a formula for assessing what jobs are available." Walls v. Barnhart, 296 F.3d 287, 291 (4th Cir. 2002).

Here, the ALJ determined that Plaintiff could perform a range of light work, but that such range was reduced because of Plaintiff's need for an at will sit/stand option, her inability to climb ladders, ropes, and scaffolds, and her inability to reach with her right upper extremity. (R. at 17.) Therefore, Plaintiff's "RFC was less than the full range of light work, but that does not mean that it is presumed to be limited to sedentary work." Koopman v. Apfel, No. 98-7002, 162 F.3d 1173, at *2 (10th Cir. 1998). Plaintiff could perform the lifting requirements of light work, but needed a sit/stand option because she could not stand as much as the definition of light work requires. Accordingly, "the ALJ properly consulted a vocational expert, who expressly testified that an individual with the plaintiff's residual functional capacity–including the need to sit or stand at will–could perform the light jobs of" office helper and labeler. Harris v. Astrue, No. 8:08-1675-

DCN-BHH, 2009 WL 6058664, at *5 (D.S.C. Nov. 13, 2009), R&R adopted by 2010 WL 1027822 (Mar. 17, 2010); (R. at 51-52.) The VE also testified that such an individual could perform the sedentary jobs of document preparer, address clerk, and telephone soliciting clerk. (R. at 52-53.) Furthermore, the VE gave two sets of statistics for each job named above. The first set was the number of jobs available in the national and regional economies without the sit/stand option; the second set was the number of jobs available with the sit/stand option. (R. at 51-53.) Given the VE's identification of a number of light exertional-level jobs that Plaintiff could perform with an at will sit/stand option, the ALJ properly relied on the VE's testimony to find that Plaintiff could perform a reduce range of light work. See Henderson, 87 F. App'x at 252-53; v. Astrue, No. 5:08CV147-RLV, 2011 WL 1527338, at *2 (W.D.N.C. Apr. 20, 2011); Harris, 2010 WL 1027822, at *11.

In her reply, Plaintiff notes that "SSR 83-10 itself acknowledges that there are 'relatively few unskilled light jobs' performed in a seated position." (Plaintiff's Reply at 2.) However, the undersigned finds that Plaintiff's argument "ignores . . . SSR 83-12, which acknowledges that there are occupations which allow a sit/stand option and directs the agency to consult with a VE to assess the impact of that option on the occupational base." Gibson, 2010 WL 4789659, at *6. "There is nothing oxymoronic in finding that a plaintiff can perform a *limited* range of light work. Such a finding is appropriate where, as here, the evidence shows that the plaintiff can perform some, though not all, of the exertional requirements of a particular range." Santiago v. Barnhart, 367 F. Supp. 2d 728, 733 (E.D. Pa. 2005). Accordingly, because the ALJ properly followed SSR 83-12 and obtained testimony from the VE regarding jobs Plaintiff could still perform with the at will sit/stand option, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff could perform a reduce range of light work.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___2___ day of ~~June~~, 2014.

_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE